J-S75003-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DEVALE MICHAEL WATTS | |
| Appellant | No. 1754 WDA 2016 |

Appeal from the Judgment of Sentence October 13, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0004144-2015

BEFORE:   SHOGAN, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY SHOGAN, J.:                    FILED FEBRUARY 1, 2018

Appellant, Devale Michael Watts, appeals from the October 13, 2016 judgment of sentence entered in the Court of Common Pleas of Allegheny County following a jury trial.  We affirm.

The trial court summarized the facts of the crime as follows:

On March 18, 2015, at approximately 9:00 p.m., the Allegheny County Sheriff's Department Fugitive Task Force arrived at Harrison Village Apartments in McKeesport, Pennsylvania to execute a criminal bench warrant for a suspect named Devante Watts.  The task force received information that the suspect would be located in Apartment 7B in Harrison Village, and they set up a perimeter around the targeted address.  Although it was dark outside, there were lights on the side of the building, and Apartment 7B was the "very last unit in the set of row houses" in that building.

Shortly after the perimeter was secured, an individual matching the suspect's description was observed exiting the front door of Apartment 7B.  Detective Jared Kulik with the Allegheny County Sheriff's Office was working with the task force

that evening in a plain-clothed capacity, and he observed the individual who was believed to be the suspect of the warrant exit the target residence and turn right towards the end of the building. The individual began walking along the side of the building. Detective Gould from the McKeesport Police Department accompanied the task force because he was familiar with the area, and with Devante Watts, the target of the warrant. Based on the individual's appearance, Detective Gould believed that the male who had exited Apartment 7B was Devante Watts, and he relayed that information to Detective Kulik.

Detective Kulik informed Deputy Sheriff Randy Grossman via radio that the individual who had exited the apartment was their "target," and he told Deputy Grossman to stop the male in order to identify him. Deputy Grossman had secured the rear perimeter of the building and was positioned closest to the suspect. Deputy Grossman was in full uniform that evening, and he was standing at the rear of the building when the suspect walked past him. After receiving the information from Detective Kulik, Deputy Grossman walked towards the suspect. As soon as Deputy Grossman said "excuse me," the suspect "tucked his hands in his front hoodie pocket and took off running." Deputy Grossman immediately said "Stop, Police. Don't move," but the male kept running despite his orders. Deputy Grossman testified that his attention was immediately drawn to [Appellant's] actions of placing his hands in his hoodie pocket, appearing to clutch something. Deputy Grossman drew his service weapon out in response.

Detective Kulik confirmed that he heard Deputy Grossman say to the individual, "Stop. Police" and that he saw the suspect start running. Both Detective Kulik and Deputy Grossman gave chase on foot. The male ran towards the rear of the building, with both Detective Kulik and Deputy Grossman yelling "Stop, Police" as they pursued him. During the pursuit, Detective Kulik saw the individual "shove" his hands into the large middle pocket of his black hooded sweatshirt. Deputy Grossman was closer to the suspect, and, as the suspect ran in between Buildings 9 and 10, Deputy Grossman observed him reach into his pocket and throw something "up" and over a fence which was to the right of the suspect. Deputy Grossman stopped running and informed Detective Kulik that "he threw something," indicating that he

"believed it could have been a firearm." Deputy Grossman did not lose sight of the suspect at any point during the pursuit.

The foot pursuit lasted approximately 10 to 15 seconds, and it ended when the suspect surrendered. The suspect was identified as Devale Watts, [Appellant] in the instant case, and the original target's brother. As soon as [Appellant] surrendered, he told Detective Kulik that he ran because he also has a warrant out for his arrest. When Detective Kulik and Deputy Grossman asked [Appellant] about the object that he had thrown during the pursuit, [Appellant] claimed that it was a cell phone.

Based on Deputy Grossman's observation of [Appellant] throwing what was believed to be a firearm, Officer Weimer and Officer Alfer from the McKeesport Police Department, as well as a canine unit, assisted in searching the area for the object. Officer Weimer ultimately spotted a nine millimeter semiautomatic Glock pistol on the other side of the fence that was located behind Building 10 in the village. The fence was approximately eight (8) to fifteen (15) feet away from the sidewalk where [Appellant] was running, and the firearm was found approximately 15-25 feet away from the fence, towards the bottom of the "steep" hill which sloped downward towards the river. Officer Weimer saw the firearm sticking out of the mud, and Officer Alfer and Detective Kulik were responsible for retrieving the firearm from the ground. Detective Kulik observed that the "dirt on the firearm was moist and wet, as if the firearm had just landed in the dirt." Officers continued to search the ground after locating the firearm. After conducting a search which lasted approximately thirty (30) minutes, a cell phone was never located anywhere in the area.

The firearm was submitted for fingerprint testing, but the examiners were unable to lift a fingerprint from the firearm. The firearm was swabbed for DNA, but touch DNA testing was not performed. Detective Kulik testified that DNA testing is not routine in all gun cases, and that such testing would be more common in cases where multiple actors are involved. Detective Kulik also testified that he believed that he did not request DNA testing because he assumed, based on a conversation he had with someone at the Medical Examiner's office, that there was not enough DNA on the firearm to perform a comparative analysis. After running an "open case file" search on the

firearm, it was discovered that the firearm was involved in an assault that took place on January 18, 2015 in the McKeesport area.

[Appellant] took the stand at trial and testified that he did not realize he was running from police. He testified that a man had "jumped out of a car" and that he was not in police uniform. [Appellant] insisted that he stopped running when Deputy Grossman ordered him to stop and informed [Appellant] that he was a police officer. [Appellant], however, also testified that one of the reasons that he ran was because he had a warrant. [Appellant] also insisted that the object that he threw was a cell phone, and that he threw the cell phone to his left, in the opposite direction of the fence.

Trial Court Opinion, 4/12/17, at 2–6 (emphases in original) (internal citations omitted).

A jury convicted Appellant of carrying a firearm without a license, 18 Pa.C.S. § 6106(a)(2), and person not to possess a firearm, 18 Pa.C.S. § 6105(c)(1), on July 21, 2016.[1] The trial court deferred sentencing pending preparation of a presentence investigation ("PSI") report. On October 13, 2016, the trial court sentenced Appellant to an aggregate eighteen-month term of intermediate punishment and a concurrent four-year period of probation. Sentencing Order, 10/13/16. Appellant filed a post-sentence motion the next day, asserting that his convictions were against the weight of the evidence. The trial court denied the motion on October 18, 2016.

_____

[1] Prior to the start of trial, the Commonwealth withdrew the charged offense of receiving stolen property, 18 Pa.C.S. § 3925(a). N.T., 7/19–21/16, at 3–4.

Appellant filed a timely notice of appeal.  Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following single issue for our review:

I.    Whether the trial court abused its discretion in not granting Mr. Watts' post-sentence motion requesting a new trial when the verdicts of guilty were contrary to the weight of the evidence?

Appellant's Brief at 5.

We have held that "[a] motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict."  Commonwealth v. Rayner, 153 A.3d 1049, 1054 (Pa. Super. 2016) (quoting Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000)).  Our Supreme Court has described the standard applied to a weight-of-the-evidence claim as follows:

The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court.  Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider de novo the underlying question of the weight of the evidence."  An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim."  Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

Commonwealth v. Cash, 137 A.3d 1262, 1270 (Pa. 2016) (internal citations omitted).  A trial court's determination that a verdict was not against the weight of the evidence is "[o]ne of the least assailable reasons"

for denying a new trial. Commonwealth v. Colon-Plaza, 136 A.3d 521, 529 (Pa. Super. 2016) (quoting Commonwealth v. Clay, 64 A.3d 1049, 1055 (Pa. 2013)). A verdict is against the weight of the evidence where "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Commonwealth v. Lyons, 833 A.2d 245, 258 (Pa. Super. 2003) (quoting Widmer, 744 A.2d at 751–752)). "[W]e do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. . . . Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion[.]" Commonwealth v. Ferguson, 107 A.3d 206, 213 (Pa. Super. 2015) (citation omitted).

A challenge to the weight of the evidence must first be raised at the trial level "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Commonwealth v. Akrie, 159 A.3d 982, 989 (Pa. Super. 2017). Appellant properly preserved his weight-of-the-evidence claim by raising the issue in his post-sentence motion filed on October 14, 2016.

Appellant asserts that the testimony proffered by Deputy Grossman was "too fantastic to be believed." Appellant's Brief at 15. Conversely, he asserts that his own testimony was credible, and thus, the verdicts shocked the judicial conscience. Id. at 15–16. Appellant suggests that "it was inconceivable to believe that [Appellant] threw the gun that was ultimately

recovered." Id. at 20. Appellant admits that the trial court's statement that Appellant's case "basically turned on credibility determinations" was correct. Id. at 21.

The trial court addressed Appellant's issue at length and authored a cogent, in-depth explanation of Appellant's claims regarding the weight of the evidence. Following our careful review of Appellant's arguments, the law, and the complete record, we discern no abuse of discretion by the trial court in denying Appellant's contention that the verdict is against the weight of the evidence. In making this determination, we rely on the trial court's opinion filed on April 12, 2017.[2]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/1/2018</u>

---

[2] We direct the parties to attach a copy of the opinion in the event of any future proceedings.

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,     CC No. 2015-4144

v.

DEVALE MICHAEL WATTS,

ORIGINAL
Criminal Division
Dept. of Court Records
Allegheny County, PA.

Defendant.     OPINION

BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Mike W. Streily, Esq.
Office of the District Attorney
401 Courthouse
Pittsburgh, PA 15219

Caleb Pittman, Esq.
Office of the Public Defender
400 County Office Building
542 Forbes Avenue
Pittsburgh, PA 15219

FILED
2017 APR 12 AM II: 59

County caseID:CP-02-CR-0004144-2015 (OPINION)
Case Description: COMMONWEALTH OF PENNSYLVANIA v. WATTS
Official Docket Entry, Sort By Document Number Ascending

| Document Number | Title/Entry | Filing Date |
|---|---|---|
| 1 | OPINION | 04/12/2017 |

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,    CRIMINAL DIVISION

vs.    CC # 2015-4144

DEVALE MICHAEL WATTS,

Defendant.

## OPINION

This is a direct appeal from the judgment of sentence entered on October 13, 2016, following a jury trial that took place between July 19, 2016, and July 21, 2016. The Defendant was charged with Carrying a Firearm Without a License (18 Pa. C.S.A. §6106(a)(2)) (Count One) and Person Not to Possess a Firearm (18 Pa. C.S.A. §6105(c)(1)) (Count Two). At the conclusion of trial, the jury convicted the Defendant of both charges. Sentencing was deferred to allow for the preparation of a Pre-Sentence Report ("PSR"). On October 13, 2016, the Defendant was sentenced to an eighteen (18) month term of restrictive intermediate punishment and a concurrent four (4) year term of probation at Count One. He received a four (4) year term of probation at Count Two, to be served concurrently with the probationary sentence imposed at Count One. The Defendant filed a timely post-sentence motion challenging the weight of the evidence presented at trial. After meaningful consideration, the motion was denied on October 18, 2016. This timely appeal followed.

1

On February 6, 2017, the Defendant filed a timely[1] Concise Statement of Errors Complained of on Appeal ("Concise Statement"). The Defendant's sole challenge on appeal is to the weight of the evidence. (Concise Statement, pp. 3-6). The Defendant's allegation of error is without merit. The court respectfully requests that the Defendant's convictions be upheld for the reasons that follow.

## I.  FACTUAL BACKGROUND

On March 18, 2015, at approximately 9:00 p.m., the Allegheny County Sheriff's Department Fugitive Task Force arrived at Harrison Village Apartments in McKeesport, Pennsylvania to execute a criminal bench warrant for a suspect named Devante Watts. (Jury Trial Transcript ("TT"), 7/19/16-7/21/16, pp. 60-62, 106-07, 127-28, 139, 149, 201-02). The task force received information that the suspect would be located in Apartment 7B in Harrison Village, and they set up a perimeter around the targeted address. (TT, pp. 61-63, 108). Although it was dark outside, there were lights on the side of the building, and Apartment 7B was the "very last unit in the set of row houses" in that building. (TT, pp. 62, 106,109).

Shortly after the perimeter was secured, an individual matching the suspect's description was observed exiting the front door of Apartment 7B. (TT, pp. 62-63, 85-86, 129). Detective Jared Kulik with the Allegheny County Sheriff's Office was working with

---

[1] The Defendant requested and received one (1) extension of time to file his Concise Statement because he was awaiting transcripts.

2

the task force that evening in a plain-clothed capacity, and he observed the individual who was believed to be the suspect of the warrant exit the target residence and turn right towards the end of the building. (TT, pp. 60, 62-63, 83, 108). The individual began walking along the side of the building. (TT, pp. 62-63, 108). Detective Gould from the McKeesport Police Department accompanied the task force because he was familiar with the area, and with Devante Watts, the target of the warrant. (TT, pp. 63, 80, 127, 134, 136). Based on the individual's appearance, Detective Gould believed that the male who had exited Apartment 7B was Devante Watts, and he relayed that information to Detective Kulik. (TT, pp. 63, 128, 130-31, 134).

Detective Kulik informed Deputy Sheriff Randy Grossman via radio that the individual who had exited the apartment was their "target," and he told Deputy Grossman to stop the male in order to identify him. (TT, pp. 63, 109). Deputy Grossman had secured the rear perimeter of the building and was positioned closest to the suspect. (TT, pp. 63, 106, 108). Deputy Grossman was in full uniform that evening, and he was standing at the rear of the building when the suspect walked past him. (TT, pp. 84, 107-09). After receiving the information from Detective Kulik, Deputy Grossman walked towards the suspect. As soon as Deputy Grossman said "excuse me," the suspect "tucked his hands in his front hoodie pocket and took off running." (TT, pp. 109, 131). Deputy Grossman immediately said "Stop, Police. Don't move," but the male kept running despite his orders. (TT, pp. 110, 132). Deputy Grossman testified that his attention was immediately drawn to the Defendant's actions of placing his hands in his

3

hoodie pocket, appearing to clutch something. (TT, p. 110). Deputy Grossman drew his service weapon out in response. (TT, p. 110).

Detective Kulik confirmed that he heard Deputy Grossman say to the individual, "Stop. Police" and that he saw the suspect start running. (TT, pp. 64, 110). Both Detective Kulik and Deputy Grossman gave chase on foot. (TT, pp. 64, 109-110). The male ran towards the rear of the building, with both Detective Kulik and Deputy Grossman yelling "Stop, Police" as they pursued him. (TT, pp. 64-65). During the pursuit, Detective Kulik saw the individual "shove" his hands into the large middle pocket of his black hooded sweatshirt. (TT, pp. 65, 85). Deputy Grossman was closer to the suspect, and, as the suspect ran in between Buildings 9 and 10, Deputy Grossman observed him reach into his pocket and throw something "up" and over a fence which was to the right of the suspect. (TT, pp. 66, 110-11, 114-16, 121, 208). Deputy Grossman stopped running and informed Detective Kulik that "he threw something," indicating that he "believed it could have been a firearm." (TT, pp. 65, 69, 94, 98, 110, 112-14). Deputy Grossman did not lose sight of the suspect at any point during the pursuit. (TT, pp. 113,120).

The foot pursuit lasted approximately 10 to 15 seconds, and it ended when the suspect surrendered. (TT, pp. 65, 66-67). The suspect was identified as Devale Watts, the Defendant in the instant case, and the original target's brother. (TT, pp. 66-67, 81, 84, 86-87, 128). As soon as the Defendant surrendered, he told Detective Kulik that he

4

ran because he also has a warrant out for his arrest. (TT, pp. 67-68, 82, 87). When

Detective Kulik and Deputy Grossman asked the Defendant about the object that he

had thrown during the pursuit, the Defendant claimed that it was a cell phone. (TT, pp.

68, 87,113).


Based on Deputy Grossman's observation of the Defendant throwing what was

believed to be a firearm, Officer Weimer and Officer Alfer from the McKeesport Police

Department, as well as a canine unit, assisted in searching the area for the object. (TT,

pp. 69, 93-94, 98, 133, 138-40, 149-49). Officer Weimer ultimately spotted a nine-

millimeter semiautomatic Glock pistol on the other side of the fence that was located

behind Building 10 in the village. (TT, pp. 69, 72, 96, 133, 135, 140-42, 150, 184). The

fence was *approximately* eight (8) to fifteen (15) feet away from the sidewalk where the

Defendant was running, and the firearm was found *approximately* 15-25 feet away from

the fence, towards the bottom of the "steep" hill which sloped downward towards the

river. (TT, pp. 95, 97, 101-02, 112, 123, 142-43, 145-46, 150-51, 154). Officer Weimer

saw the firearm sticking out of the mud, and Officer Alfer and Detective Kulik were

responsible for retrieving the firearm from the ground. (TT, pp. 70, 73, 95, 142-43, 146,

150-51, 153). Detective Kulik observed that the "dirt on the firearm was moist and wet,

as if [] the firearm had just landed in the dirt." (TT, p. 73). Officers continued to search

the ground after locating the firearm. After conducting a search which lasted

approximately thirty (30) minutes, a cell phone was never located anywhere in the area.

(TT, pp. 73-74, 143, 145, 152, 154).

5

The firearm was submitted for fingerprint testing, but the examiners were unable to lift a fingerprint from the firearm. (TT, pp. 74). The firearm was swabbed for DNA, but touch DNA testing was not performed. (TT, pp. 74-75, 90). Detective Kulik testified that DNA testing is not routine in all gun cases, and that such testing would be more common in cases where multiple actors are involved. (TT, pp. 78-79, 88-89). Detective Kulik also testified that he believed that he did not request DNA testing because he assumed, based on a conversation he had with someone at the Medical Examiner's office, that there was not enough DNA on the firearm to perform a comparative analysis. (TT, pp. 100-01, 103). After running an "open case file" search on the firearm, it was discovered that the firearm was involved in an assault that took place on January 18, 2015 in the McKeesport area. (TT, pp. 91-93).

The Defendant took the stand at trial and testified that he did not realize he was running from police. (TT, pp. 200-203). He testified that a man had "jumped out of a car" and that he was not in police uniform. (TT, pp. 202, 207). The Defendant insisted that he stopped running when Deputy Grossman ordered him to stop and informed the Defendant that he was a police officer. (TT, pp. 203-04, 207-09). The Defendant, however, also testified that one of the reasons that he ran was because he had a warrant. (TT, p. 207). The Defendant also insisted that the object that he threw was a cell phone, and that he threw the cell phone to his left, in the opposite direction of the fence. (TT, pp. 204, 208).

6

## II.     DISCUSSION

A. The Defendant's convictions for Carrying a Firearm without a License and Person Not to Possess a Firearm were not against the weight of the evidence.

In challenging the weight of the evidence, the Defendant attacks the credibility determinations made by the jury and focuses on the lack of physical and scientific evidence linking him to the firearm. (Concise Statement, pp. 3-6). It is well-established that a challenge to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict." Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000); Commonwealth v. Hunzer, 868 A.2d 498, 507 (Pa. Super. 2005), appeal denied, 880 A.2d 1237 (Pa. 2005) ("A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed.") (emphasis added). In reviewing claims that the verdict was against the weight of the evidence, our appellate court has explained that

> [t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

Commonwealth v. Lewis, 911 A.2d 558, 565 (Pa. Super. 2006) (emphasis added); Commonwealth v. Torres, 578 A3d 1323, 1326 (Pa. Super. 1990) ("The determination whether to grant a new trial on the ground that the verdict is

7

against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion.").

In determining whether a trial court abused its discretion in denying a motion for a new trial based on a claim that the verdict was against the weight of the evidence, our Supreme Court has cautioned that

> [a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. [Widmer, *supra*, at 751-52]. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" [Widmer, *supra*] at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." [Commonwealth v. Brown, 648 A.2d 1177, 1189 (Pa. 1994).

Commonwealth v. Clay, 64 A.3d 1049, 1055 (Pa. 2013). Indeed, "appellate review of a trial court's decision on a weight of the evidence claim is extremely limited."

Commonwealth v. Torres, 578 A3d 1323, 1326 (Pa. Super. 1990). Courts have reasoned that

> [b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.

Widmer, *supra*, at 753. Stated differently, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was

8

not against the weight of the evidence and that a new trial should be granted in the interest of justice." Clay, *supra*, at 1055 (quoting Widmer, *supra*, at 753).

The facts of this case are straightforward and clearly support the verdict. The salient facts involve a *uniformed* police officer approaching the Defendant, the Defendant fleeing at the very sight of the uniformed officer, the uniformed officer ordering the Defendant to stop multiple times as he identified himself as an officer, the Defendant disobeying repeated commands to stop, the Defendant making a furtive movement towards the pocket of his hoodie, and the Defendant admittedly throwing an object, which was believed by a police officer to be a firearm and which was later confirmed to be, in fact, a firearm. Deputy Grossman never lost sight of the Defendant during the pursuit, and he consistently, and convincingly, testified that the object was thrown to the right of the Defendant, over the fence. The firearm was subsequently recovered in an area that is consistent with where one would expect the thrown object to land.

Although the Defendant testified to a radically different version of events, the conflict in the testimony presented was solely for the jury to resolve. While the Defendant correctly notes that the Commonwealth did not present DNA evidence or surveillance footage linking him to the firearm, his "CSI" argument loses substantial force when considered against common sense and the evidence as whole. It also seeks to distract one's attention away from the fact that the finding of guilt in this case

9

was centered entirely on credibility determinations, a matter which is solely within the province of the fact-finder. As noted, the jury was free to believe all, part, or none of the evidence presented in this case, and it was solely the duty of the jurors to evaluate the testimony and determine the credibility of witnesses.

While this court did not sit as the fact-finder in this case, it did have the opportunity to observe the witnesses' demeanor and tone as they testified. This court had no trouble understanding why the jury rejected the Defendant's testimony in favor of the Commonwealth's evidence. The Commonwealth's witnesses testified confidently and consistently, and their accounts of events were highly corroborated by each other's testimony. The Defendant, on the other hand, came across as disingenuous and not credible, and his version of events did not have that "ring of truth" that a fact-finder searches and listens for in every case.

In his Concise Statement, the Defendant attacks the credibility of Deputy Grossman by relying on a purported inconsistency between Detective Kulik's report and Deputy Grossman's testimony at trial. (Concise Statement, pp. 3-4). However, close examination of the record does not reveal any inconsistencies, but rather an oversight on the part of Detective Kulik, for which Deputy Grossman is not responsible. The Defendant attempts to argue that because Detective Kulik's report failed to specify that the object Deputy Grossman observed the Defendant throw was a firearm, Deputy Grossman's testimony at trial was, therefore, fabricated. (TT, pp. 114, 160). Deputy

10

Grossman testified convincingly that he did inform Detective Kulik that he believed the thrown object to be a firearm, (TT, pp. 113-14), and Detective Kulik twice testified that Deputy Grossman told him that he believed that the object was a firearm. (TT, pp. 69, 94). The fact that Detective Kulik did not specify in his report that the thrown object was a firearm does not equate with a finding of fabrication on the part of Deputy Grossman, nor does it provide a legitimate basis to disbelieve Deputy Grossman's testimony.

Furthermore, the issue of whether Deputy Grossman was actually able to make out that the object was a firearm was for the jury to decide, and not for this court to question. The court will note that Deputy Grossman testified that the gun was large. Based on his experience as a law enforcement officer who has previously been in similar situations, it does not "strain the bounds of credibility" to accept his belief that the object thrown was a firearm. (TT, pp. 111, 13); (Concise Statement, p. 3).

Next, the Defendant asserts that the weight of the evidence did not support a finding that the firearm was the object that was thrown by the Defendant. (Concise Statement, pp. 3-4). He takes issue with the location where the gun ultimately was found, and he argues that it is "highly unlikely" that the Defendant "could have thrown the gun to that location while running." (Id.). First, the testimony *estimated* that the firearm was found anywhere between 23-40 feet away from where the Defendant was running. (TT, pp. 95, 97, 101-02, 112, 123, 142-43, 145-46, 150-51, 154). Second, the jury was more than entitled to use common sense to reasonably infer that the gun did

11

not actually land 40 feet away from the Defendant, but that instead, it rolled down the steep hill after being thrown. (TT, p. 73). That reasonable inference, coupled with Detective Kulik's testimony that the firearm had fresh dirt on it and looked as if it it had just landed in the dirt, supported the jury's determination.

The Defendant next argues that the jury should have believed the Defendant's alternative explanation of events. (Concise Statement, pp. 5). Again, the court will simply note that credibility determinations are solely for the jury to make, and the jury was well-entitled to reject the Defendant's story that he threw a cell phone to his left and that he did not realize he was running from police. The Defendant's story was completely uncorroborated by any other evidence. The Defendant also contradicted his own testimony by admitting that one of the reasons he ran was because he had a warrant out for his arrest. (TT, p. 207). The logical inference is that he knew he was being approached by police from the outset, and this inference is supported by the fact that Detective Kulik and Deputy Grossman both testified that Deputy Grossman was in full uniform and that Deputy Grossman immediately identified himself as police and ordered the Defendant to stop walking before the Defendant ran away. (TT, pp. 64, 84, 109-10, 132).

The jurors were also was entitled to use their common sense to conclude that the multiple officers on the scene would not search an area that was in the complete opposite direction of where they observed the throwing motion. It would be a waste of

12

their time and resources to focus their attention on an area that was not believed to have contained the thrown object. Additionally, Officer Weimer testified that his canine officer was deployed on the other side of the fence where the sidewalk and buildings were, and the canine did not locate anything in that area despite its training to locate items with "recent human odor." (TT, pp. 144,145). Multiple officers testified that no cell phone was ever found in the area despite a thirty (30) minute search, and Officer Alfer testified that they continued searching the area even after locating the firearm. (TT, pp. 73-74,143, 152).

Finally, the Defendant argues that there was an alternative explanation for the presence of the gun in that area, positing that it could have been placed there by someone who had committed the earlier assault in January of 2015. (Concise Statement, p. 5). Again, this was a point of contention that was for the jury to consider and resolve. The jury evidently decided to credit Detective Kulik and his testimony that "the dirt on the firearm was moist and wet, as if [] the firearm had just landed in the dirt." (TT, p. 73). Such a finding does not shock the conscience, and such a finding makes more sense than the illogical theory put forth by the Defendant at trial.

The Defendant essentially seeks to retry his case on appeal. Indeed, the arguments set forth in support of the Defendant's weight claim are arguments that were presented to the jurors for their consideration, and ultimately rejected by them. It is not the function of this court, or the reviewing court, to second-guess the credibility

13

determinations made by the jury or the jury's resolution of any conflicting testimony or theory of the case. Having heard the evidence presented, the court notes that it certainly did not defy the bounds of logic to conclude that the Defendant possessed the firearm that was retrieved from the sloped hill behind the fence. The evidence convincingly proved beyond a reasonable doubt that the object that the Defendant admitting to throwing was a firearm.

In sum, there were no facts in this case that were "so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice," and the verdict was not "so contrary to the evidence so as to shock one's conscience." Clay, supra, at 1055. Thus, this court did not palpably abuse its discretion in denying the weight claim that was presented in the Defendant's post-sentence motion. Lewis, supra, at 565 ("where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence" but rather "whether the trial court palpably abused its discretion in ruling on the weight claim"). Accordingly, the Defendant's sole allegation of error on appeal is without merit, and the verdict in this case should be upheld.

III. CONCLUSION

The Defendant's allegation of error on appeal is without merit. Based on the foregoing, the verdict was not against the weight of the evidence. Accordingly, this court respectfully requests that the verdict and sentence in this case be upheld.

14

BY THE COURT:

_____, J.
BETH A. LAZZARA, JUDGE

_____
DATE  4/12/17

15